**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Starstone National Insurance Company, | No. CV-23-08074-PCT-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Kinsale Insurance Company, et al., | |
| Defendants. | |

The Court now considers Defendant Kinsale Insurance Company's Motion for Summary Judgment (Doc. 131), Defendant Burlington Insurance Company's Motion for Partial Summary Judgment (Doc. 133), and Defendant National Union Fire Insurance Company of Pittsburgh, PA's Motion for Partial Summary Judgment (Doc. 136). The motions are fully briefed. The Court rules as follows.

I.    **BACKGROUND**

Plaintiff StarStone National Insurance Co. ("StarStone") brings this action against Defendants Kinsale Insurance Company ("Kinsale"), Burlington Insurance Company ("Burlington"), and National Union Fire Insurance Company of Pittsburgh, PA ("National Union"). The parties are collectively referred to as the "GNM Insurance Carriers."

StarStone's Amended Complaint alleges as follows. In August 2015, Willow Creek Road, LLC ("Willow Creek") hired Decca Multi-Family Builders, Inc. ("Decca") to be its general contractor for the construction of an apartment complex (the "Project"). (Doc. 42 at 2–3 ¶ 9.) Decca hired GNM Companies, LLC ("GNM") for carpentry and framing work.

(*Id.* at 3 ¶¶ 10–11.)

During construction, GNM had the following insurance policies. Kinsale issued a commercial general liability policy which was effective from January 14, 2016 until January 14, 2017. (*Id.* at 5 ¶ 18.) The Kinsale policy had a $1 million limit for each occurrence with a $2 million aggregate limit. (*Id.* at 5 ¶ 18.) StarStone provided excess liability insurance during this period. (*Id.* ¶ 19.) The StarStone policy provided excess liability coverage for $5 million per occurrence above the Kinsale policy. (*Id.*)

Burlington then provided GNM with commercial general liability insurance from January 14, 2017 until January 14, 2018. (*Id.* ¶ 20.) The Burlington policy had a $1 million limit for each occurrence with a $2 million aggregate limit. (*Id.* at 6 ¶ 20.) National Union provided excess liability insurance during this period. (*Id.*) The National Union policy provided excess liability coverage for $5 million per occurrence above the Burlington policy. (*Id.* ¶ 21.)

During 2017, the Project underwent inspections which revealed GNM's defective work. (*Id.* at 3 ¶ 12.) Willow Creek then terminated Decca which sued Willow Creek for breach of contract in Arizona state court. (*Id.* ¶¶ 13–14.) Willow Creek brought counterclaims against Decca and third-party claims against GNM and other subcontractors. (*Id.* ¶ 15.) Willow Creek's claims against GNM were predicated on "numerous construction defects caused by GNM's work on the Project, resulting in damages to different portions of the buildings within the Project." (*Id.* at 5 ¶ 17.) Much of this damage was incurred due to water intrusion after several rain events. (*Id.* at 3 ¶ 13.)

In response to the lawsuit, Kinsale and Burlington took the position that Willow Creek's claims against GNM all involve a single "occurrence" under their respective policies. (*Id.* at 6 ¶ 24.) StarStone disagreed, contending that the claims asserted against GNM involve multiple occurrences. (*Id.* ¶ 25.) Nevertheless, StarStone participated in the Willow Creek Lawsuit under a reservation of rights. (*Id.*)

In August 2023, GNM, Decca, and Willow Creek entered into a settlement agreement. (*Id.* at 7 ¶ 27.) Under the agreement, all claims against GNM were resolved

and the GNM Insurance Carriers agreed to render payment to Willow Creek on GNM's behalf.  (*Id.*)   Concurrently, GNM and the GNM Insurance Carriers entered into a settlement funding agreement which outlined each of the GNM Insurance Carriers' contribution to the settlement payment.  (*Id.* ¶ 28.)  Kinsale and Burlington "refused to pay more than" $1 million each based on their position that the claims against GNM for defective construction involved a single occurrence.  (*Id.* at 9 ¶ 39.)  StarStone thus had to contribute funds to the settlement payment and now seeks to recoup its contribution.  (*Id.* at 12 ¶ 60.)  StarStone contends that its contribution was unnecessary because the Willow Creek's claims against GNM involved multiple occurrences and thus the Kinsale and Burlington aggregate limits were not exhausted.  (*Id.* at 7 ¶ 30.)

Accordingly, StarStone requests declaratory relief, equitable subrogation, and equitable indemnity against Kinsale and Burlington.  (*Id.* at 8–11.)  In the alternative, StarStone seeks equitable contribution from National Union.  (*Id.* at 12.)  StarStone asserts that "all or the majority of the damage allegedly resulting from GNM's alleged acts and omissions occurred during the 1/14/2017–1/14/2018 policy period, when the Burlington Policy was the effective primary policy and the National Union Policy was the effective excess policy."  (*Id.* ¶ 58.)

Each Defendant answered the Amended Complaint.  Burlington filed an Answer which included counterclaims and crossclaims against Kinsale.  (Doc. 43.)  National Union filed an Answer which included counterclaims and crossclaims against Burlington and Kinsale.  (Doc. 47.)  Kinsale filed an Answer which included crossclaims against Burlington and National Union.  (Doc. 51.)

Kinsale's Motion asks for summary judgment on all claims and crossclaims asserted against it and by it.  (Doc. 131 at 3.)  Burlington's Motion asks for summary judgment on its counterclaims.  (Doc. 133 at 7.)  National Union's Motion asks for summary judgment on StarStone's claim for declaratory relief.  (Doc. 136 at 3.)  The Court considers these motions together because each motion primary concerns whether this case involved multiple occurrences.

## II.    LEGAL STANDARD

Summary judgment is appropriate in circumstances where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of a case under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes are genuine when the evidence could allow a reasonable jury to find in favor of the nonmoving party.  *Id.*  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" or by showing "that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)–(B).  Additionally, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When considering a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court must draw all reasonable inferences in the nonmovant's favor.  *Anderson*, 477 U.S. at 255.  Additionally, the Court does not make credibility determinations or weigh the evidence.  *Id.*  The determination of whether a given factual dispute requires submission to a jury is guided by the substantive evidentiary standards that apply to the case.  *Id.*

The burden initially falls on the movant to demonstrate the basis for a motion for summary judgment and "identify[] those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp.*, 477 U.S. at 323.  If this initial burden is not met, the nonmovant does not need to produce anything even if they would have the ultimate burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  However, if the initial burden is met by the movant, then the nonmovant has the burden to establish that there is a genuine issue of material fact.  *Id.* at 1103.  The nonmovant "must do more than simply

show that there is some metaphysical doubt as to the material facts." *Zenith Radio Corp.*, 475 U.S. at 586. Bare assertions alone do not create a material issue of fact, and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

## III. DISCUSSION

The central issue in this case is determining whether damage caused by water intrusion constitutes a single "occurrence" under Kinsale's and Burlington's policies. The remaining issues in this case pertain to reallocation of the settlement damages among the GNM Insurance Carriers.

At a general level, the parties seemingly do not dispute that water intrusion affected the Property beginning in 2016. However, the parties dispute the particular facts surrounding the water intrusion. For instance, Burlington's expert "identifies a single defect in GNM's work that led to water intrusion and resulting property damage beginning in 2016." (Doc. 134 at 4.) On the other hand, StarStone's and National Union's experts identify multiple construction defects which caused water intrusion at different times. (Doc. 153 at 4.) The Court declines to resolve this factual dispute at this juncture. Nonetheless, the Court resolves the legal issues raised in the motions.

### A. Occurrence

The Kinsale and Burlington policies cover up to $1 million in property damage caused by an "occurrence." (Doc. 134 at 2–3.) The policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.*) Under this language, Kinsale and Burlington argue that "water intrusion damage constitutes a single 'occurrence' because it represents either an accident or 'continuous or repeated exposure to substantially the same general harmful conditions.'" (Doc. 131 at 10; Doc. 156 at 6.) StarStone and National Union disagree.

Before addressing the number of occurrences, the Court makes clear what the occurrence is in this case. In the faulty construction context, and under similar policy language, Arizona courts hold that faulty construction itself is not an occurrence. *E.g.*, *U.S.*

- 5 -

*Fid. & Guar. Corp. v. Advance Roofing & Supply Co.*, 788 P.2d 1227, 1233 (Ariz. Ct. App. 1989).

For example, the court in *Lennar Corp. v. Auto-Owners Ins. Co.*, 151 P.3d 538, 544 (Ariz. Ct. App. 2007) interpreted commercial general liability policies with the same definition of "occurrence" at issue here. The court recognized that "faulty workmanship, standing alone cannot constitute an occurrence . . . nor would the cost of repairing the defect constitute property damages." *Id.* at 545 (citation modified). Instead, "[a]ccording to Arizona law, there can be no 'occurrence' within the meaning of an insurance policy until a plaintiff sustains actual damage." *Id.* at 548. One court explained that this accords with "the fundamental nature of a comprehensive general liability policy" which requires that "an occurrence be an accident." *Advance Roofing*, 788 P.2d at 1233. If faulty workmanship was deemed an occurrence, then "the insurer becomes a guarantor of the insured's performance of the contract, and the policy takes on the attributes of a performance bond." *Id.*

Thus, GNM's faulty construction is not an occurrence. Neither are the cost incurred to repair GNM's faulty construction.[1] Instead, water intrusion is the occurrence because that is the "general harmful condition" which caused the property damage. *See Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 309 (Tenn. 2007) (finding that water intrusion was an occurrence where a contractor improperly installed windows which resulted in water intrusion). The Court next addresses the parties dispute regarding the method used to determine the number of occurrences.

### B. Number of Occurrences

Before addressing the number of occurrences in this case, the Court must establish the correct method for determining so. Kinsale and Burlington argue that the number of occurrences must be determined based on the water intrusion itself. These parties rely on

---

[1] National Union contends that there are multiple occurrences because in addition to the water intrusion, GNM performed "defective work on the plywood roof sheathing" which caused "shiners." (Doc. 159 at 21.) Shiners are described as protruding nails which "damaged the roofing underlayment another subcontractor had installed, requiring it to be removed and replaced." (*Id.* at 7.) This issue is not heavily briefed, but based on *Lennar*, it appears that the shiners would not give rise to an occurrence.

*Cincinnati Indemnity. Co. v. Southwestern Line Constructors Joint Apprenticeship & Training Program*, 422 P.3d 1086 (Ariz. Ct. App. 2018), which interpreted the same policy language at issue here. There, two men "were working at the top of a utility pole at [a] training facility" which broke, causing the men to fall and sustain serious injuries. *Id.* at 1087. The men sued the training facility operator, which agreed to settle the matter up to its policy limits. *Id.* Like the polices here, the operator's policy "limit[ed] coverage to $1,000,000 per 'occurrence,' with a total aggregate claims limit of $2,000,000." *Id.*

The court held that the number of occurrences depends on the number of accidents, not the number of "precipitating causes of the accident." *Id.* Accordingly, the court rejected the argument that each negligent act that contributed to the pole breaking was an occurrence. *Id.* Instead, the court found that the pole breaking was an accident, and therefore, there was only one occurrence under the policy. *Id.* at 1089. In so holding, *Cincinnati* differentiated itself from *Arizona Property and Casualty Insurance Guaranty Fund v. Helme*, 735 P.2d 451 (Ariz. 1987), the case StarStone and National Union primarily rely on. In short, these parties contend that *Helme* provides that the number of occurrences is determined based on the number of discrete instances of GNM's faulty work which caused the water intrusion. (Doc. 154 at 7; Doc. 159 at 10.)

*Helme* involved two doctors whose independent negligent acts resulted in a patient's death. 735 P.2d at 454. The doctors were covered under a single policy which "indemnif[ied] its insureds separately up to the limit per occurrence for 'each occurrence' in which an insured became legally obligated to pay damages because of professional negligence." *Id.* at 456. "The policy define[d] 'occurrence' as 'any incident, act or omission, or series of related incidents, acts or omissions resulting in injury.'" *Id.* (citation modified). The question was whether the doctors' negligent acts constituted multiple occurrences.

The Court found that "the number of acts producing injury or damage, rather than the number of injuries caused, is the key on which the definition of 'occurrence' turns." *Id.* at 457. Thus, "[m]ultiple acts causing a single injury will constitute multiple

occurrences" unless these acts are "causally related to each other as well as to the final result.'" *Id.* at 457–58.

The *Cincinnati* court determined that *Helme* did not inextricably link the number of occurrences with the number of causative acts. 422 P.3d at 1088. Instead, *Cincinnati* recognized that *Helme* is confined to the policy language before it. *Id.* Again, the *Helme* "policy . . . defined 'occurrence' as 'any incident, act or omission, or series of related incidents, acts or omissions resulting in injury.'" *Id.* (quoting *Helme*, 735 P.2d at 456). *Cincinnati* thus found that "[t]he policy at issue in *Helme* defined 'occurrence' in relation to incidents, acts, or omissions that result in injury." *Id.* However, *Cincinnati* found that where "occurrence" is defined as an "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," the number of occurrences is tethered to the number of accidents, "not the precipitating causes of the accident." *Id.*

This Court agrees with *Cincinnati* to the extent it finds that *Helme* does not superimpose a particular method of determining the number of occurrences. In Arizona, "[a]n insurance policy is a contract, and in an action based thereon *the terms of the policy must govern.*" *Apollo Educ. Grp., Inc. v. Nat'l Union Fire Ins. Co.*, 480 P.3d 1225, 1228 (Ariz. 2021) (emphasis added) (citation modified). Generally, Arizona courts recognize that the use of different language implies that a different meaning is intended. *See Burns v. Ariz. Pub. Serv. Co.*, 517 P.3d 624, 631 (Ariz. 2022). Thus, it is reasonable that *Cincinnati* and *Helme* arrived at different methods of determining the number of occurrences given that the policies in those cases defined that term differently.

StarStone and National Union's arguments to the contrary are unavailing. StarStone contends that *Helme* adopted the so-called "cause test." (Doc. 154 at 7.) Under this test, "the number of acts causing injury, rather than the number of injuries, determines the number of occurrences." (*Id.*) However, *Helme* did not lay down a formal test which universally applies to "occurrence." Still, National Union points out that *Helme* found "that the number of causative acts is the key to interpreting 'per occurrence' clauses." (Doc. 159 at 10.) While *Helme* did find as much, it is important to read this phrase in

context, because *Helme* did not lay down an interpretive maxim.

Again, *Helme* dealt with the following definition of "occurrence": "any incident, act or omission, *or series of related incidents, acts or omissions* resulting in injury." 735 P.2d at 456 (emphasis in original). The court was particularly concerned with interpreting the italicized language. *See id.* To do so, the Court noted that the policy's use of the terms "acts or omissions 'resulting in injury'" signaled that the policy employed a "causal test." *Id.* Given that the policy used causal language when defining "occurrence," the court thus found "that the number of causative acts is the key to interpreting 'per occurrence' clauses." *Id.* at 457. Thus, *Helme* does not require "occurrence" to universally be defined in reference to discrete causative acts. The *Helme* court's conclusion extends no further than the policy before that court. Indeed, subsequent courts found that *Helme* does not compel a particular outcome where policies use different terms. *See, e.g.*, *GRE Ins. Grp. v. Green*, 980 P.2d 963, 965 (Ariz. Ct. App. 1999) ("We find that *Helme* is distinguishable from this case because of a significant difference in the terms used in the policies."); *Grain Dealers Mut. Ins. Co. v. Sharbono*, No. CV-12-02607-PHX-GMS, 2013 WL 6252435, at *3 (D. Ariz. Dec. 4, 2013) (noting that "the definition of 'occurrence' in *Helme* is significantly different from that in the present case" which "does not define 'occurrence' in causal language, rather it defines 'occurrence' as an 'accident' with no reference to the causes of injury in the accident").

Based on the foregoing, the Court finds as follows. *Lennar* makes clear that "damage caused by the faulty work, not the faulty work itself, constitute[s] an occurrence." 151 P.3d at 545. The damage here is water intrusion. Thus, *Cincinnati* provides that the number of occurrences is determined by looking at the water intrusion rather than the faulty workmanship which caused it. *See* 422 P.3d at 1088.

## C. Water Intrusion

The Court now addresses whether water intrusion constitutes a single occurrence. Again, the policies cover property damage caused by an occurrence which includes "an accident, including continuous or repeated exposure to substantially the same general

harmful condition."

The issue of whether water intrusion, as opposed to the faulty construction, constitutes a single occurrence is not heavily briefed. Kinsale and Burlington appear to assume that if the number of occurrences is tethered to the water intrusion, then there can only be one occurrence. StarStone briefly contends that even if water intrusion is used as the basis to determine the number of occurrences, the Court cannot determine the number of occurrences because there are factual disputes relating to the water intrusion. (Doc. 152 at 8.) StarStone contends that there is evidence demonstrating that there are "several instances of water intrusion, in separate Project locations, at different months in 2016 and 2017, caused by multiple distinct elements of deficient work performed by GNM." (*Id.* at 8–9.) Assuming this to be the case, the Court agrees there would be multiple occurrences.

Again, the policies state that "an accident, including continuous or repeated exposure to substantially the same general harmful conditions" can give rise to a single occurrence. Based on this language, there are two scenarios in which there will be multiple occurrences: (1) where there are distinct harmful conditions; and (2) where one condition is not "continuous or repeated." The first scenario is not implicated here because water intrusion is one general harmful condition. Thus, the question is whether a condition is "continuous or repeated" when it causes distinct injuries at distinct times.

The Court begins with the word "continuous." Generally, an event is continuous if it is "uninterrupted . . . in space, time, or sequence." *Continous*, Merriam-Webster, https://www.merriam-webster.com/dictionary/continuous (last visited Mar. 6, 2026). Applied here, water intrusion is not continuous where it affects different portions of a property at different times. That is because the intrusion would be coming from different sources and would be separated by both space and time. Water intrusion might be considered continuous where it comes from the same source and thus affects multiple parts of a property at the same time. For example, when a single rainstorm causes water damage to multiple buildings on a property. While Burlington contends that the water intrusion

here is "one ongoing harmful condition," (Doc. 133 at 15), it fails to explain how that can be the case if the intrusion occurs in different places at different times from different sources.

The Court turns next to the word "repeated." An event is repeated if it is "done or presented again." *Repeated*, Merriam-Webster, https://www.merriam-webster.com/dictionary/repeated (last visited Mar. 6, 2026) (citation modified). Water intrusion is not repeated where it affects different parts of a property at different times. Although the general harmful condition remains the same, the two events differ in time and location. Such differences preclude the events from being considered "repetitive." To conclude otherwise would render the phrase "continuous or repeated" moot. At bottom, Kinsale and Burlington's proposed interpretation determines the number of occurrences solely by examining the underlying harmful condition. While this is a necessary condition for there to be multiple occurrences, it is not sufficient. As noted, for there to be one occurrence, the harmful condition to be "continuous or repeated," which naturally suggests that there are instances where a condition may not be continuous or repeated. As a practical matter, it appears that a condition occurring at different times and locations would plainly be understood as failing the "continuous or repeated" requirement. Indeed, Kinsale and Burlington fail to offer when a water intrusion would not be continuous or repeated. More troublesome, these parties' theory lacks a limiting principle; under their theory, water intrusion would seemingly be one occurrence even if separated by a span of years..[2]

---

[2] A court illustrated a similar concept with the following set of examples:

> First, an above-ground storage tank leaks undetected for a period of time. Any damage can be said to be continuous from the initial event. Second, assume the leakage resulted from a transfer line which operates only intermittently. Whenever the transfer line is used, a tank valve leaks. In this situation, the damage is not caused by a continuous exposure to conditions, i.e., a steady leak from the faulty tank, but rather by a repeated exposure to the same conditions, i.e., the transfer line and the faulty valve which intermittently leaks. Third, Change the foregoing hypothetical to include both the faulty tank and the transfer line with the faulty valve. If both the tank failure and the valve leakage were the result of over-pressurization, it is arguable that only one occurrence has taken place, i.e., the over-pressurization which resulted in damage. On the other hand, if the tank failure was caused, for example, by a negligent forklift driver who inadvertently punctured the tank without realizing it, while the valve

Accordingly, the Court concludes that under the terms of the policies, there are multiple occurrences where a single harmful condition causes distinct injuries at different times and at different locations. Indeed, an inapposite conclusion would prove impractical. If water intrusion occurring in different places at different times constitutes one occurrence, the Court fails to see when a condition could ever give rise to multiple occurrences. At bottom, Burlington and Kinsale's position lacks a limiting principle. Under their position, once a condition exists, any subsequent manifestation of that condition would still be a single occurrence.

The Court notes that its conclusion is not repugnant to *Cincinnati*. Again, that case involved certain negligent acts which caused a pole to break and injure two men. 422 P.3d at 1087. The court determined the number of occurrences based on the number of accidents, "not the precipitating causes of the accident." *Id.* at 1088. There, the accident was the pole breaking, which was clearly one occurrence. *See id.* However, the accident here is water intrusion which could have possibly occurred at different places and times resulting in different instances of property damage. To analogize, it would be as if two negligently constructed poles fell on different days. Although any injuries would be caused by the same general condition—falling poles—that condition could not be fairly categorized as repeated or continuous. The same is true here.

Until this point, the Court assumed that the water intrusion affected the Property in different areas at different times. However, the question of how many discrete occurrences arise out of this case "depends heavily on the specific facts." *See Landmark*, 2014 WL 12558121, at *6. Given there are factual disputes regarding the water intrusion in this case, the Court is unable to determine the exact number of occurrences at this juncture. However, having reviewed the evidence, the Court finds that water intrusion affected the Property at different areas at different times. Accordingly, the Court concludes that this

---

malfunction was caused by the over-pressurization of the transfer line, it would seem that two occurrences have taken place, because each one resulted from different causal conditions.

*Landmark Am. Ins. Co. v. Liberty Surplus Ins. Corp.*, No. CV 12-10728-MWF (JEMx), 2014 WL 12558121, at *4 (C.D. Cal. Apr. 9, 2014) (citation modified).

case involves multiple occurrences.

### D. Allocation

The Court next addresses issues related to reallocation of the settlement contributions. The Court begins with Kinsale's argument that there is no basis to reallocate the current pro rata contributions to the settlement based on the "continuous-trigger rule." (Doc. 131 at 16.) The Court disagrees. *Lennar* issues clear guidance on how damages are allocated under the types of policies at issue here.

The *Lennar* court noted as follows. "The nature of an occurrence policy . . . is to provide coverage for all occurrences that take place during the policy period." *Lennar*, 151 P.3d at 548. "According to Arizona law, there can be no 'occurrence' within the meaning of an insurance policy until a plaintiff sustains actual damage." *Id.* However, "property damage resulting from 'continuous or repeated exposure' may accrue over time." *Id.* "In such cases, the relevant date for coverage purposes is the date the property damage occurs, even if that damage is incremental." *Id.*

In *Lennar*, the policies at issue covered "'property damage' only if: the 'property damage' occurs during the policy period." *Id.* The court found that this language plainly provides that the "insurers must provide coverage for ongoing property damage that occurs during the policy period even if other similar damage preceded that damage." *Id.* at 549. Kinsale's and Burlington's policies contain identical language. (Doc. 135 at 6; 19.) Thus, these insurers must cover damage that occurs during their respective policy periods. "The question of how much damage, if any, was actually sustained during any given policy period" is a fact question. The Court will not resolve that factual question at this juncture.

Kinsale has failed to point this Court to any authority suggesting that despite *Lennar*, the continuous trigger theory applies here or that the settlement contributions should be made on a pro rata basis. On this latter point, Kinsale relies on cases such as *Arizona Joint Underwriting Plan v. Glacier General Assurance Co.*, 631 P.2d 133 (Ariz. Ct. App. 1981) and *Harbor Insurance Co. v. United Services Automobile Ass'n*, 559 P.2d 178 (1976). The Court is not convinced that these cases demand a pro rata allocation here

given that: (1) *Lennar* was decided after these cases under circumstances very similar to those present here; and (2) *Glacier* and *Harbor* both involved concurrent insurance policies, not policies from different periods as is the case here.

In a similar vein, the Court rejects, in part, Burlington's argument that its policy does not provide any coverage. Burlington contends "that the property damage caused by water intrusion was in the process of occurring when the Burlington policy incepted." (Doc. 133 at 16.) "Therefore, that property damage is excluded" because its policy "provides that coverage does not extend to property damage that was in the process of occurring as of the inception date of the Burlington Policy." (*Id.*)

The Court agrees with Burlington insofar as it argues that its policy does not cover property damage that was in the process of occurring prior to the inception of its policy. Burlington's policy plainly does not cover such damage. However, the Court rejects Burlington's argument insofar as it suggests that its policy does not provide coverage for any property damage caused by water intrusion because water intrusion was already occurring. As discussed, water intrusion can give rise to multiple occurrences and thus multiple instances of property damage. Accordingly, the Burlington policy does not provide coverage if either: (1) property damage did not occur during the policy period; or (2) property damage did occur but that discrete instance of property damage was already occurring prior to the policy period. However, if water intrusion caused a discrete instance of property damage during Burlington's policy period, the Burlington policy would cover such damage.

The Court cannot make specific reallocation determinations at this juncture. As noted, the parties present conflicting evidence as to which property damage occurred at which times.

Accordingly, the Court declines to grant summary judgement.

IV.    **CONCLUSION**

Accordingly,

**IT IS ORDERED denying** Kinsale's Motion for Summary Judgment (Doc. 131).

**IT IS FURTHER ORDERED denying** Burlington's Motion for Partial Summary Judgment (Doc. 133).

**IT IS FURTHER ORDERED granting** Defendant National Union's Motion for Partial Summary Judgment (Doc. 136).

Dated this 9th day of June, 2026.

Honorable Susan M. Brnovich
United States District Judge